Case number 15-1318 et al. Wilkes-Barre Hospital Company, LLC, doing business as Wilkes-Barre General Hospital Petitioner v. National Labor Relations Board. Ms. Cassetta for Petitioner, Ms. Isbell for Respondent. Case number 15-1318 et al. Wilkes-Barre General Hospital Petitioner v. National Labor Relations Good morning, Your Honors. May it please the Court, Kaitlin Cassetta for Wilkes-Barre Hospital Company, LLC, doing business as Wilkes-Barre General Hospital. The hospital appears before this Court today challenging a Board decision in order that required the hospital to continue the payment of longevity-based wage increases to represented bargaining unit members after the expiration of the party's 2011-2013 collective bargaining agreement. There are three grounds upon which the hospital challenges the Board's decision in order. The first is a threshold matter dealing with the Regional Director's authority to issue the underlying consolidated complaint and notice of hearing, and I'd like to briefly address that at the end of my argument because I believe it's important that we address the merits of this case, which is the Board's improper interpretation of the party's collective bargaining agreement, which pursuant to the clear precedent of this case is not entitled to deference. And in order to do that, we should look first at the collective bargaining agreement at issue in this case. I would refer you to the appendix where the collective bargaining agreement exists or resides, page 223 of the appendix or page 269 of the appendix. This article, it's really the first five sections that are at issue in this case. The Board reads this article to require the statutory obligation to continue the payment of longevity-based increases. They do that based solely on a reading of sections 4 and 5 that is not supported by the contract as an integrated whole. And by that, I'm really referencing sections 1 through 3, which the Board discards as irrelevant because the Board claims that sections 1 through 3 deal only with across-the-board increases due to employees over the three years of the contract. That's simply inaccurate. If you look at section 1, for example, it is just placing employees into the proper longevity categories. There is actually no across-the-board increase required by section 1. And then sections 2 and 3 are an integrated wage increase set for a specific date certain, January 27th of 2012 in section 2 and January 27th of 2013 in section 3. And as was explained during the underlying hearing for the administrative law judge, these wage increases are a combination of an across-the-board increase and a longevity-based increase. You're supposed to, if you're an employee who moves up in the longevity scale, you would move up and you might be entitled to an additional across-the-board increase or you may not, depending on the percentage of increase that you receive. So it's clear that the increases contemplated by the parties collective bargaining agreement were given on three dates certain. The first really just states that it's an integrated wage increase due on specific contract dates. The board's attempt to extrapolate that sections 4 and 5 require the ongoing payment of longevity-based increases to maintain the status quo is simply inaccurate. There's truly nothing in section 4 that would arguably support the board's contract interpretation, which I again stress is not entitled to deference from this court. And section 5 includes one line relating to when longevity increases will be paid. And not coincidentally, that date is January 27th, the same date upon which they received the integrated wage increase set forth on the three specific dates. Next I'd like to take you to Appendix A, which is the other portion of this contract that's relevant to this court's interpretation. Appendix A is on page 296 of this court's appendix. In Appendix A refers to simply wages as set forth by Article 25. Not wages as set forth by Article 25 sections 1 through 3, not wages only referring to across the board increases, but truly an integrated reading of Article 25 is set forth by Appendix A. The first thing that's notable about Appendix A is the specific durational language that it contains. And I quote, during the term of this agreement, the initial wage scale and subsequent applicable increases to the same shall be in accordance with the following. And just as is set forth in sections 1 through 3 of Article 25, here the appendix sets forth the three dates certain, specifies month and year, upon which wage increases will be granted to these bargaining unit employees. That really begs the question that the board decided here. The board determined that under the agreement, this was the regime, and then we know by operation of law, if a new agreement isn't promptly entered, that the same terms for longevity raises pertain, unless and until a new agreement is put into place. So the fact that this speaks in terms of this agreement with the assumption that a new agreement would promptly follow doesn't really prove anything one way or another about whether these are terms that should continue. I respectfully disagree because the use of limiting language is actually precisely what would prevent the board from saying this is a part of the status quo that needs to be maintained. But the term of the agreement overall has been held not to be limiting language. That's correct. But the term of the agreement specifically has been held to be limiting language by the 8th Circuit and Finley Hospital. So there you actually have another court looking at almost the identical language, I believe to quote Finley Hospital, it's during the term of this agreement as applied in the wage article. And while that's 8th Circuit precedent and I recognize it's not controlling on this court, the Supreme Court precedent from which the 8th Circuit derives its decision is controlling and does moderate the same outcome here. And the question really is about whether these longevity-based increases can be said to be continued beyond this contract. That bumps us back to interpreting the contract. And the board's not entitled to deference there. I noted already the language, the limiting language from Finley that the 8th Circuit found to be controlling there. I note that it's the same language as was used here. I also note that both the board in its underlying decision and the board's appellate counsel relied heavily on the board's decision in Finley to support the underlying board decision in order here. And since Finley's been struck down by the 8th Circuit, it's only appropriate here too that this court review. But what does what does Appendix A have to do with longevity pay? It doesn't say anything about longevity pay. It actually, it would. If you read down the- I realize it could, but it doesn't. Well, if you read the columns vertically, the years- I'm looking at them. It doesn't say anything about longevity pay. Flipping you, referencing you back to Article 25, it's Sections 1 through 3 that reference Appendix A. And in Appendix, let me just get there myself. In Sections 1 through 3, the service levels. So that would be the longevity that the board is referencing, is these various service levels, 0 to 2 years, 3 to 4 years. But clearly, the reference is, to the extent Appendix A speaks to longevity-based increases, it does so in connection with Sections 1 through 3 of Article 25, which is a fact that the board has just dismissed out of hand. I'm really not following it. They're two different things. I believe that they are references to the level of service or the service level is the number of years. And when the board references longevity-based increases, it's referencing changes in the number of years of service an employee accrues from year to year. Yeah. And you move on some grid based on longevity, right? The only grid that exists is the grid in Appendix A, which is a combined grid that sets forth the minimums and also, as set forth in Sections 1 through 3, which also discusses the across the board increases that would be due. Right. So, I mean, all you're really saying is that the grid remains whole until you have a new agreement, but the longevity, you still move within that grid. I would disagree on the basis of the specific durational language set forth, not only by Appendix A, but also the dates certain set forth by Sections 1 through 3. If you're going to be looking at the grid in Appendix A, you're doing so pursuant to Sections 1 through 3. And Sections 1 through 3 are very clear. They say you get an increase in May of 2011, one in January of 2012, one of January 2013, and that's it. And that's, in fact, why the board doesn't find that there's any violation by the ceasing of the payment. But there are two kinds of increases that you can get, right? There's two kinds, but they're integrated together. Well, I mean, that's just a self-serving term. They didn't look terribly integrated to me. They just look like two different. One, you're arguing with some force is fixed because you haven't gotten an increase in the boxes, but my longevity keeps going. And so, if I'm now up to three years, I move down to that 2107 box. And then, if you still are fighting over a contract for longer, and I'm up to five years, I move down to 2205. But only in 2011, 2012, and 2013. Well, you stick with the 2013 under your theory, but you still have longevity. So the overall wage doesn't necessarily increase. That's a separate question. But the nurses here are general premise. And indeed, they get longevity pay for service that they didn't even have with this employer. So there's just a logic to it that extends beyond the particular agreement. And there's nothing in the agreement that seems to limit it, according to the board. And we obviously give substantial deference to the board. Now, with regard to contract interpretation, and if I may briefly respond, I know I'm over my time, but I do think it's the case that Appendix A is quite limited in nature. And if the board found that Sections 1 through 3 established that the across-the-board increases are on date certain, and it is Sections 1 through 3 that create Appendix A, then the logic must follow. And certainly, there's nothing here that suggests the longevity increases were intended to trump the express contract language utilized by the parties, which here clearly limited wage increases. And I know that I'm out of time. I'll briefly mention that this is consistent with the party's past practice in 2010 and 2011 as well, which should go both to the interpretation of the contract language, as well as the question of to the extent there would have been a status quo that would have continued, whether under the contract coverage doctrine, that should have the union have waived its right to insist upon the continuation. I didn't address the regional director arguments, but certainly those are briefed thoroughly by my client. Thank you. Ms. Isbell. May it please the Court, Chloe Isbell here on behalf of the National Labor Relations Board. While we're still looking at the joint appendix and the contract, let's look at Sections 4 and 5 of Article 25. Sections 4 and 5 say that minimum wage minimums shall be based on the employee's length of continuous service. Section 5 says that scale increases according to longevity shall become due on January 27th of the following year. Sections 4 and 5 refer to longevity pay. That's not limited by a date certain. Sections 1 through 3 do talk about annual, across the board, increases for nurses, and those are limited to dates certain. Longevity pay is discussed in Sections 4 and 5. It is not so limited. The Board has never found that language such as during the term of this agreement ends a mandatory term and condition of employment at the time of contract expiration. It takes some clear and unmistakable waiver to show that a mandatory term and condition of bargaining has expired with the contract. Language such as shall terminate in this Court's decision in Cawthorn, for example, that kind of language will terminate it. Ms. Cassetta relies heavily on Findlay Hospital in your response. Findlay Hospital, the Court in that case found that it was a one-year contract and the language in that contract led the Court to believe that there was, it was not intended, that it was a three percent, three percent across the board wage increase that would have been annual. And the Court found that under a one-year contract and the language in that contract, the parties did not other wage provisions. So there was a, there were set wages, but the actual issue about what was going to continue past contract expiration were regular annual three percent increases. All right. I think unless you have something further, I think that's fine. You may have one minute. Okay. I will try not to even take the whole minute. I simply want to point out the Board's reliance on the clear and unmistakable waiver doctrine, which as this Circuit knows has not been accepted in the D.C. Circuit. Rather, the D.C. Circuit relies on the contract coverage doctrine, a standard under which the Court would look to the party's contract and interpret the party's And with regard to Finley, counsel for the Board is correct that there is discussion of the one-year term of the contract, but there is separate language discussing the specific durational language identical to the language in this case. What is your language here? During the term of this agreement as set forth in Appendix A. It's in Appendix A, not back in Article 25 in the body, but in Appendix A. I would say that the specific language in 25 is articles or Sections 1 through 3 has the date certain. Okay. Thank you very much. It is submitted.
judges: Pillard, Edwards, Sentelle